UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-22587-CIV-MORENO/SIMONTON
<u>CONSENT CASE</u>

WEA FARMS, LIMA PERU,

    Plaintiff,

v.

AMERICAN AIRLINES, INC.,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was before the Court for a non-jury trial on June 21, 2006. Based upon the consent of the parties, this matter has been referred to the undersigned Magistrate Judge for final disposition of all matters (DE # 32).

On September 8, 2005, Plaintiff Wea Farms, Lima Peru (hereafter WEA FARMS), filed a three-count Complaint in state court against Defendant American Airlines, Inc. (hereafter AMERICAN AIRLINES), alleging bailment (Count I), negligence (Count II) and breach of contract (Count III). Specifically, WEA FARMS alleges that, on or about June 24, 2005, at Lima, Peru, Defendant AMERICAN AIRLINES, a common carrier, accepted from WEA FARMS 962 cartons of fresh asparagus in good order and sound condition for air transportation to Miami, Florida, but that the asparagus was delivered damaged in Miami. WEA FARMS alleges damages of $23,407.50 plus related fees, charges and expenses (Attached to DE # 1). AMERICAN AIRLINES then removed the case to this Court (DE # 1), and subsequently filed its Answer (DE # 3).

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1441.

Based upon an evaluation of the evidence as a whole and considering the

credibility of the witnesses, including their demeanor and motives, the undersigned Magistrate Judge makes the following Findings of Fact and Conclusions of Law.

B. **Findings of Fact**[1]

1. Plaintiff, WEA FARMS, is a corporation located in Lima, Peru, engaged in business as a grower and shipper of asparagus.

2. Defendant, AMERICAN AIRLINES, is a corporation engaged in business as a common carrier by air of passengers and cargo.

3. On or about June 25, 2005, WEA sold 962 boxes of fresh asparagus to Rosemont Farms Corp. in Boca Raton, Florida. The three invoices representing this sale reflect amounts of $7,152.00, $3,288.00, and $1,196.00, for a total of $11,636.00. However, Peter Warren, who at the time of shipment was the director of international operations for Rosemont Farms, and at the time of trial was an owner of WEA, testified that the asparagus had been sold on a consignment basis, and that Rosemont had been presold to a customer in Boston. Mr. Warren testified that the fair market value of the asparagus to WEA, based upon the pre-sale price, was $24.00 per box. The pretrial stipulation states that the parties would not contest the fact that the fair market value of the cargo at the time of delivery was $23,112.00, which is approximately $24.00 per box.

4. WEA hired Capital Freight Services as its freight forwarder with respect to the shipment of the above asparagus, and paid for the services of Capital Freight. Capital Freight made a cargo reservation for the asparagus with American Airlines. Capital Freight acted as the agent of both WEA and American Airlines with respect to this

---

[1] Any Findings of Fact which are more properly treated as Conclusions of Law are to be treated as such, and *vice versa*.

2

shipment of asparagus.[2]

5. The asparagus was delivered to the Lima airport in refrigerated trucks in two shipments. The asparagus was packaged in open cartons, through which the asparagus was visible. The first shipment arrived at approximately 3:30 p.m. on the afternoon of June 25, 2005, and the second shipment arrived at approximately 12:30 a.m. on the morning of June 26, 2005. The shipment was received at a warehouse at the airport that is operated by Swissport. American Airlines requires that all of its shipments use this warehouse, and American Airlines pays Swissport for its services. Upon arrival at the warehouse, Swissport produced receiving documents for both shipments. These documents were prepared by Swissport in the presence of a Capital Freight representative, and were signed by both Swissport and Capital Freight. The documents reflected the condition and quantity of the asparagus received, including the temperature of the asparagus. The temperature of the first shipment was four degrees Celsius; and, the temperature of the second shipment was three degrees Celsius. The asparagus was accepted, and the condition noted to be "O.K." Capital Freight, acting as the agent for AMERICAN AIRLINES, issued Air Waybill number 001-7673-9795, with no exceptions noted thereon, for transport of the asparagus to Miami, Florida. The Air Waybill stated that the asparagus was perishable and was to be kept refrigerated at all times.

6. The asparagus was moved into the cold section of the Swissport warehouse and the asparagus was prepared for shipment for AMERICAN AIRLINES. Swissport packed cartons containing the asparagus into five LD-3 air shipping containers

---

[2] In its answers to interrogatories, American Airlines admitted that Capital Freight acted as its agent in Peru.

belonging to and provided by AMERICAN AIRLINES. AMERICAN AIRLINES did not make any other kind of container available for the asparagus. LD-3 containers are made of aluminum, are not insulated, and are commonly used by airlines to allow cargo to be loaded, stowed, and unloaded from an airplane along a track system with more efficiency than if the boxes were freely stowed. AMERICAN AIRLINES routinely and customarily transports asparagus in LD-3 containers.

7. From the warehouse, the asparagus was taken and loaded directly into the airplane. The undersigned finds that Capital Freight Services and Swissport received the asparagus in good condition, and that the asparagus was in good condition when it was loaded onto the airplane.[3]

8. On Sunday, June 26, 2005, at 8:20 a.m., the asparagus departed Lima, Peru on AMERICAN AIRLINES flight 2110.

9. At approximately 2:39 p.m, on Sunday, June 26, 2005, AMERICAN AIRLINES flight 2110 arrived at Miami International Airport.

10. AMERICAN AIRLINES did not notify Customized Brokers, the customs broker for the consignee, Rosemont Farms, of the asparagus' arrival until 9:37 a.m. on Monday, June 27, 2005, more than eighteen hours after the asparagus arrived. The Air Waybill instructed AMERICAN AIRLINES to notify Customized Brokers when the asparagus arrived.

11. Customized Brokers is open seven days a week and twenty-four hours a day.

---

[3] This finding is supported by the above testimony regarding the information contained on the shipping documents, and corroborated by the testimony of Brian Mahoney, the surveyor who examined the asparagus on the afternoon of June 27, 2005, who opined that, in his experience, the physical damage to the asparagus would have appeared more severe if the asparagus had been damaged prior to the transportation on June 26, 2005.

12. AMERICAN AIRLINES has four cool areas at their Miami International Airport warehouse facility, but did not place the asparagus in any of the cool areas, instead leaving the asparagus exposed to the summer heat in Miami.

13. Once AMERICAN AIRLINES notified Customized Brokers of the asparagus' arrival, Customized Brokers made prompt arrangements with United States Customs to clear the asparagus and to have a truck pick up the asparagus from AMERICAN AIRLINES.

14. At 12:10 p.m. on June 27, 2005, the United States Department of Agriculture cleared the asparagus to be fumigated. At approximately 12:51 p.m. on June 27, 2005, the trucking company hired by Customized Brokers to pick up the shipment arrived at AMERICAN AIRLINES' Miami International Airport warehouse facility. When the asparagus was presented to the truck driver, he immediately noticed a problem with the asparagus, reported the problem to AMERICAN AIRLINES, and refused to take delivery. AMERICAN AIRLINES acknowledged the heated condition of the asparagus and agreed to place the asparagus in the cooler and to have a surveyor inspect the cargo for damage. AMERICAN AIRLINES did not place the asparagus in the cooler until after 1:00 p.m. on June 27, 2005.

15. At 3:00 p.m. on June 27, 2005, the surveyor, Brian Mahoney, Jr., inspected the asparagus at AMERICAN AIRLINES' warehouse. When Mahoney arrived, the asparagus was in the cooler. Mahoney inspected the asparagus and found that it had suffered severe heat damage. He took the temperature of the asparagus and recorded a high temperature reading of 92.7 degrees Farenheit.

16. Later that day, and after the survey was concluded, Customized Brokers' trucker picked up the asparagus in a refrigerated truck for fumigation in an effort to

salvage the asparagus. On the morning of June 28, 2005, the asparagus was fumigated. Later that day the asparagus was delivered to Rosemont Farms' appointed warehouse, North Bay Produce.

17. Despite efforts to salvage the asparagus, Rosemont Farms was unable to salvage any of the product and the asparagus was a total loss.

18. As stated in uncontested facts portion of the Amended Pretrial Joint Stipulation, (DE # 28 at para. 6.a), on the date of delivery, the asparagus had an undisputed fair market value of $23,112.00. Rosemont Farms incurred surveyor costs of $295.50. WEA FARMS' total damages were $23,407.50.

C. **Conclusions of Law**

I. **The Montreal Convention**

19. The parties agree that the Convention for International Carriage by Air, also know as the Montreal Convention 1999 WL 33292734 (hereafter "the Convention"), controls the international transport of the asparagus which is at issue here.

20. Art 13 of Montreal Convention states, in pertinent part, "it is the duty of the carrier to give notice to the consignee as soon as the cargo arrives."

21. Article 18.1 of the Convention states, " [t]he carrier is liable for damage sustained in the event of the destruction or loss of damage to cargo upon condition only that the event which caused the damage took place during the carriage by air."

22. Article 18.2 of the Convention states,

> However, the carrier is not liable if and to the extent it proves that the destruction, or loss of, or damage to the cargo resulted from one or more of the following:
>
> a) inherent defect, quality or vice of that cargo;
>
> b) defective packaging of that cargo performed by a person other than the

6

carrier or its servant or agents;

c) an act of war or an armed conflict;

d) an act of public authority carried out in connection with the entry, exit or transit of the cargo.

23. Article 18.3 of the Convention states "[t]he carriage by air within the meaning of paragraph 1 of this article comprises the period during which the cargo is in the charge of the carrier."

24. Article 26 of the Convention states, in pertinent part, that "[a]ny provision tending to relieve the carrier of liability or to fix a lower limit than that which is provided by this Convention is null and void".

### II. Judgment Is Entered For WEA FARMS Because The Proximate Cause of the Damage To The Asparagus Was AMERICAN AIRLINES' Negligence In Not Notifying The Consignee As Soon As The Asparagus Arrived

#### A. WEA FARMS Delivered The Asparagus To American Airlines In Good Condition and AMERICAN AIRLINES Delivered The Asparagus to The Consignee In Bad Condition

25. A prima facie case of absolute liability under the Convention is established upon a showing that the goods were delivered to the carrier in good condition, were delivered to the consignee at destination in damaged condition, and resulted in a specified amount of damage. *See Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1014 (11th Cir. 1987) (interpreting Warsaw Convention). When the shipment is not in a sealed container, the carrier has the initial burden of informing itself of the condition of the goods received. *See A.I.G. Uruguay Compania v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003) (interpreting Carmack Amendment), *citing Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d at 1014. Where the container is open and visible, a recitation of good condition on the bill of lading creates a rebuttable presumption, or a

prima facie case of delivery in good condition.  See *A.I.G. Uruguay Compania v. AAA Cooper Transp.*, 334 F.3d at 1003-04; *Terman Foods, Inc. v. Omega Line*, 707 F.2d 1225, 1227 (11th Cir. 1983) (interpreting Carriage of Goods by Sea Act[COGSA]).  After such a showing by the plaintiff, the burden shifts to the defendant to produce evidence controverting the bill of lading.  See *Caemint Food, Inc. v. Brasiliero*, 647 F.2d 347, 352-54 (2d Cir. 1981) (interpreting COGSA).

26. The evidence at trial shows that WEA FARMS delivered the asparagus in open cartons to AMERICAN AIRLINES in Lima, Peru, in good condition.  AMERICAN AIRLINES furnished the LD-3 containers into which it required the asparagus to be loaded for transportation.  AMERICAN AIRLINES, through its agent, Swissport, then packed the cartons of asparagus in LD-3 containers.[4]

27. It is undisputed that at the time AMERICAN AIRLINES delivered the asparagus to the consignee, the asparagus was determined to be in bad condition.

B. **AMERICAN AIRLINES Was Negligent In Not Notifying The Consignee As Soon As The Asparagus Arrived**

28. AMERICAN AIRLINES had a duty to notify the consignee as soon as the asparagus arrived at Miami International Airport.  This duty stems both from Article 13 of the Convention, as well as from paragraph 11 of AMERICAN AIRLINES' Air Waybill, which states, "[n]otice of arrival of goods will be given promptly to the consignee or to the person indicated on the face hereof as the person to be notified".

---

[4] There was no witness from either Swissport or American Airlines who testified regarding the relationship between Swissport and American Airlines.  A representative of Capital Freight Services provided the only testimony regarding this relationship, and he testified that Swissport operated the warehouse facility used by American Airlines, used containers for packing that were furnished by American Airlines, and was paid by American Airlines.  Based upon his testimony, the undersigned concludes that Swissport was a servant or agent of American Airlines.

29.  It is undisputed that the asparagus arrived at Miami International Airport on Sunday, June 26, 2005 at 2:39 p.m.

30.  It is undisputed that AMERICAN AIRLINES did not provide the consignee with notice of arrival until 9:37 a.m. on Monday, June 27, 2007, almost nineteen hours later. As admitted by Raymond Salaz, American Airlines' customer service coordinator, the undersigned finds and concludes that this was not prompt notification.

31.  AMERICAN AIRLINES has provided no reasonable excuse for its failure to comply with its obligations under the Montreal Convention and under its own Air Waybill, and to contact the consignee as soon as the asparagus arrived in Miami.

32.  It is undisputed that AMERICAN AIRLINES did not place the asparagus in the cooler, and that the asparagus was left in the hot Miami summer sun for almost nineteen hours.

33.  The failure by AMERICAN AIRLINES to notify the consignee as soon as the asparagus arrived at Miami International Airport constituted negligence and a breach of contract and was the proximate cause of the damage to the asparagus.

C.  **Any Deficient Packaging of the Asparagus By WEA FARMS Is Irrelevant As It Was Not The Proximate Cause of the Damage To The Asparagus**

34.  AMERICAN AIRLINES' air tariff, section 7, titled "Perishables" states, in pertinent part, that:

> a.  Perishable shipments will be considered properly packaged by the shipper or responsible party at the time of acceptance.  Shipments which are liable to deteriorate or perish due to changes in climate, temperature, altitude or other ordinary exposure, must be prepared and properly packed to withstand a 72 hour transit, regardless of the service level requested or provided.  Proper packaging is defined as packaging capable of protecting the contents from damage due to high or low temperature extremes which may prevail in flight, or at a transfer point, or at origin or destination when available facilities cannot protect the shipment against such conditions.

  **b. American Airlines shall not be liable for the spoilage of perishable shipments in transit less than 72 hours.**

 35. For the purposes of this Order, the undersigned will assume that Section 7 of AMERICAN AIRLINES' air tariff is not contrary to Article 26 of the Convention, which states that any provision which tends to relieve a carrier of liability or which fixes a lower limit than that which is laid down in the Convention is void.  Rather, it will be construed as defining what constitutes proper packaging, and what will be considered defective packaging with respect to perishable goods.

 36. At the outset, the undersigned finds that, based on the limited evidence presented in this case, AMERICAN AIRLINES has not established that the defective packaging was caused by someone other than itself or its agents (Capital Freight and Swissport), and, thus, liability is established under Article 18.2 of the Montreal Convention.  However, even assuming that WEA FARMS or its agent, and not AMERICAN AIRLINES nor an agent of AMERICAN AIRLINES, was responsible for the decision to package the cartons of asparagus into the LD3 containers, the undersigned finds that the failure to pack the asparagus to withstand a 72 hour transit was not the proximate cause of the damage to the asparagus.  Rather, the damage was caused by AMERICAN AIRLINES' negligence in failing to contact the consignee when the asparagus arrived in Miami, and in waiting almost nineteen hours to contact the consignee, while leaving the asparagus in the hot summer weather.  The perishable goods limitation cannot relieve AMERICAN AIRLINES of its duty of prompt notification.[5]

---

[5] The undersigned rejects the contention of American Airlines that the need for fumigation would necessarily have resulted in the asparagus remaining in the hot summer weather.  If there had been prompt notification, the broker could have made arrangements for the asparagus to be picked up immediately and stored in a refrigerated truck while awaiting fumigation.  In addition, the undersigned rejects the contention by

37.  WEA FARMS is entitled to prejudgment interest.  *See Sunderland Marine Mutual Ins. Co., Ltd. v. Weeks Marine Construction, Co.*, 338 F.3d 1276, 1280 (11th Cir. 2003).

Therefore, based upon the above Findings of Fact and Conclusions of Law, it is hereby

**ORDERED AND ADJUDGED** that Judgment is entered for Plaintiff WEA FARMS against Defendant AMERICAN AIRLINES, in the amount of $23,407.50, plus prejudgment interest.  The Court retains jurisdiction over motions for attorney's fees and costs and for determination of the amount of prejudgment interest.  On or before May 2, 2007, the parties shall confer concerning the amount of prejudgment interest to be awarded to Plaintiff WEA FARMS.  If the parties are unable to agree on the amount, then on or before May 16, 2007, Plaintiff WEA FARMS shall file a motion to establish the amount of prejudgment interest to be awarded.  All pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Miami, Florida, on April 18, 2007.

/s/ Andrea M. Simonton
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies provided to:**
**counsel of record**

---

American Airlines that its failure to provide prompt notification is ameliorated by the fact that the broker knew the expected flight number and could have checked on the actual arrival of this flight by examining the internet site.  The Montreal Convention places the duty of notification squarely on the carrier.